IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) ) | 4:04CV3184 |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| COMMERCIAL HEDGE SERVICES, INC., d/b/a PRIME TRADING COMPANY; PRIME TRADING COMPANY INC.; LAWRENCE JOSEPH VOLF; PT HOLDINGS, INC., d/b/a PRIME TRADING; SHERMAN COUNTY MANAGEMENT, INC., and SHERMAN COUNTY BANK, | ) ) ) ) ) ) ) ) ) | **MEMORANDUM AND ORDER** |
| Defendants. | ) ) ) | |
| SHERMAN COUNTY BANK and SHERMAN COUNTY MANAGEMENT, INC., | ) ) ) | |
| Third-Party Plaintiffs, | ) ) | |
| vs. | ) ) | |
| R. J. O'BRIEN & ASSOCIATES, INC., | ) ) ) | |
| Third-Party Defendant. | ) | |

The third-party defendant, R. J. O'Brien & Associates, Inc. ("R. J. O'Brien"), has filed a motion to vacate the order that was entered on March 16, 2005, by Magistrate Judge Piester, granting leave for the filing of the third-party complaint by two of the defendants, Sherman County Bank and Sherman County Management, Inc. In the alternative, R. J. O'Brien moves for dismissal of the third-party complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).

An appeal from Judge Piester's order has also been filed by the plaintiff, the Commodity Futures Trading Commission.  The Commission's appeal will be denied for failure to file a supporting brief as required by local rule.  See NECivR 72.2(a) ("The appealing party shall file contemporaneously with the statement of appeal a brief setting forth the party's arguments that the magistrate judge's order is clearly erroneous or contrary to law.  A party may not merely reference or refile the original brief submitted to the magistrate judge.  A party failing to file a brief in support of the appeal may be deemed to have abandoned the appeal.").  The Commission's motion for an enlargement of time to file its brief (i.e., until after the third-party defendants' motion has been resolved) will also be denied.[1]

A motion for the vacation of an order allowing the filing of a third-party complaint is addressed to the court's sound discretion.[2]  Swenson v. Suhl, 19 F.R.D. 517, 519 (D.Neb. 1956); Bill Curphy Co. v. Lincoln Bonding & Ins. Co., 13 F.R.D. 146, 147 (D.Neb. 1952).  This discretionary standard assumes, of course, that at least one of the claims alleged in the third-party complaint is within the scope of Rule 14(a) impleader, that is, a claim as to which the third-party defendant "is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff."[3]  Fed. R. Civ. P. 14(a).  Otherwise, the court may not exercise

---

[1]  A duplicate motion filed by the Commission (with proposed order attached) will be ordered stricken, as improvidently filed.

[2]  "Any party may move to strike the third-party claim, or for its severance or separate trial."  Fed. R. Civ. P. 14(a).  "Even though the rule does not mention a motion to vacate an order granting leave to serve a third-party complaint, this procedure is widely recognized by the courts."  6 Charles Alan Wright, Arthur R. Miller & May Kay Kane, Federal Practice and Procedure § 1460, p. 459 (2d ed. 1990).

[3]  Not all of the claims alleged in the third-party complaint must be within the scope of Rule 14(a).  "A party asserting a claim for relief as . . . [a] third-party claim, may join . . . as many claims . . . as the party has against an opposing party."  Fed. R. Civ. P. 18(a).

supplemental jurisdiction over the third-party complaint.[4]  See 28 U.S.C. § 1367(a).[5]  The first step, therefore, is to identify the nature of the Commission's claims against the Bank and the Management Company.

This is an enforcement action brought pursuant to Section 6c of the Commodity Exchange Act, 7 U.S.C. § 13a-1.  The Commission alleges that beginning in April

---

[4]  In the present case, Sherman County Bank is chartered in Nebraska, Sherman County Management, Inc., is a Nebraska corporation, and R. J. O'Brien is an Illinois corporation.  Diversity of citizenship thus exists, and the $75,000 jurisdictional amount of 28 U.S.C. § 1332 presumably is also satisfied.  However, the claims that Sherman County Bank and Sherman County Management, Inc., have alleged against R. J. O'Brien in the third-party complaint—for indemnification, contribution, and subrogation—are contingent claims that could not have been brought as part of an original action.  See, e.g., In re American Commercial Lines, Inc., 781 F.2d 114, 116 (8th Cir. 1985) (indemnification claim did not present "actual controversy" under Declaratory Judgment Act because plaintiff's liability had not been established).  By permitting impleader of a third-party defendant that "is or may be liable" to the third-party plaintiff, Rule 14(a) "is designed to [permit a federal district court to] decide contingent liability as well as primary liability, and the third-party claim can accelerate determination of the liability, if any, between the third-party plaintiff and the third-party defendant.  Williams v. Ford Motor Credit Co., 627 F.2d 158, 160 (8th Cir. 1980).  The third-party plaintiff must also have standing to bring the claim against the third-party defendant.  That is, "a judgment must inure to the benefit of the third-party plaintiff, and not the original plaintiff."  Wright, Miller & Kane, supra note 2, § 1446, p. 379.  If a third-party complaint is not properly brought, the court has no subject matter jurisdiction, and the complaint should be dismissed.  See Morris v. Lenihan, 192 F.R.D. 484, 487 (E.D.Pa. 2000), and additional cases cited therein.

[5]  "Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a).

3

2002 and continuing through at least March 2003, three of the defendants, Lawrence Joseph Volf, Prime Trading, Inc., and Commercial Hedge Services, Inc. ("CHS"), "committed fraud and executed unauthorized trades in more than 80 Nebraska farmers' commodity futures hedge accounts in violation of Sections 4b(a)(2)(i) & (iii),[6] 4o(1)[7] and 4c(b)[8] of the Act, 7 U.S.C. §§ 6b(a)(2)(i) & (iii), 6o(1) and 6c(b), and

---

[6] It shall be unlawful (1) for any member of a registered entity, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any registered entity, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

> (i) to cheat or defraud or attempt to cheat or defraud such other person;
>
> . . .
>
> (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; . . .

7 U.S.C.A. § 6b(a)(2).

[7] It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator by use of the mails or any means

Sections 33.10[9] and 166.2[10] of the Regulations, 17 C.F.R. §§ 33.10 and 166.2." (First

---

or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C.A. § 6o(1).

[8]   No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe. Any such order, rule, or regulation may be made only after notice and opportunity for hearing, and the Commission may set different terms and conditions for different markets.

7 U.S.C.A. § 6c(b).

[9]   It shall be unlawful for any person directly or indirectly:

(a) To cheat or defraud or attempt to cheat or defraud any other person;

(b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

(c) To deceive or attempt to deceive any other person by any means whatsoever

Amended Complaint (Filing 25), ¶ 2.) Sherman County Bank is alleged to have aided and abetted the fraud and unauthorized trading, in violation of Section 13(a)[11] of the

---

    in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

17 C.F.R. § 33.10.

[10]  No futures commission merchant, introducing broker or any of their associated persons may directly or indirectly effect a transaction in a commodity interest for the account of any customer unless before the transaction the customer, or person designated by the customer to control the account:

    (a) Specifically authorized the futures commission merchant, introducing broker or any of their associated persons to effect the transaction (a transaction is "specifically authorized" if the customer or person designated by the customer to control the account specifies (1) the precise commodity interest to be purchased or sold and (2) the exact amount of the commodity interest to be purchased or sold); or

    (b) Authorized in writing the futures commission merchant, introducing broker or any of their associated persons to effect transactions in commodity interests for the account without the customer's specific authorization; Provided, however, That if such futures commission merchant, introducing broker or any of their associated persons is also authorized to effect transactions in foreign futures or foreign options without the customer's specific authorization, such authorization must be expressly documented.

17 C.F.R. § 166.2.

[11]  Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully

6

Act, 7 U.S.C. § 13c(a). Sherman County Bank and Sherman County Management, Inc., are are also alleged to be liable as principals under Section 2(a)(1)(B) [12] of the Act, 7 U.S.C. § 2(a)(1)(B). According to the Commission, the relationship of the defendants is as follows:

- **CHS** is a Nebraska corporation and is currently registered with the Commission as an introducing broker and with the Securities and Exchange Commission as notice broker dealer. CHS is guaranteed by R. J. O'Brien, which is registered with the Commission as a futures commission merchant.

- **Prime Trading, Inc.**, is a Nebraska corporation that was operated as a branch office of CHS. During the relevant period, Sherman County Management, Inc., and Volf each owned a 50% interest in Prime Trading, Inc.

- **Volf** has been listed as a principal and registered as an "associated person" of CHS since 1988, and has been registered as a branch manager of CHS since 1999. Volf was also listed as a principal and registered as an

---

causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

7 U.S.C. § 13c(a).

[12] The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7 U.S.C.A. § 2(a)(1)(B).

7

"associated person" of Prime Trading, Inc. He is a vice president of Sherman County Bank, and a loan officer.

- **PT Holdings, Inc.**, is a Nebraska corporation that does business as Prime Trading. It is the successor corporation of Prime Trading, Inc., and is currently registered as an independent introducing broker.[13]

- **Sherman County Management, Inc.**, is a single bank financial holding company that owns 100% of Sherman County Bank. It was listed with the Commission as a principal of Prime Trading, Inc.

- **Sherman County Bank** is a state chartered bank located in Loup City, Nebraska.

(See First Amended Complaint, ¶¶ 15-20, and 25.)

The Commission alleges that Sherman County Bank strongly encouraged its agricultural loan customers to participate in a commodity trading program that was established by Prime Trading, Inc., a commodities broker jointly owned by Volf, one of the bank's loan officers, and Sherman County Management, Inc., the bank holding company. The purpose of the program was to hedge the bank customers' corn crops, but the Commission alleges that unauthorized, speculative trades were made during 2002 that caused the program participants to lose $5.1 million. The bank allegedly made loans to cover its customers' margin calls while the losses were accumulating, and persuaded customers to stay in the program by representing that their losses would be recouped. Sherman County Management, Inc., allegedly also obtained or

---

[13] The Commission alleges that Sherman County Management, Inc., divested itself of all of its interest in Prime Trading, Inc., in June 2004, and that the Federal Deposit Insurance Corporation required Volf to resign as president of Prime Trading, Inc., in order to remain a bank officer. (See First Amended Complaint, ¶¶ 65-66.)

8

guaranteed loans for Prime Trading, Inc., in order to continue the program. The Commission alleges that Prime Trading, Inc., used R. J. O'Brien to execute the trades, but does not allege that R. J. O'Brien was guilty of any wrongdoing.

In addition to seeking injunctive relief and imposition of civil penalties, the Commission has requested the entry of an order requiring the defendants to disgorge any benefits they received as a result of the alleged unlawful practices and to make full restitution to all of the participants in the 2002 commodity trading program. It is on the basis of the demand for restitution that the bank and its holding company have impleaded R. J. O'Brien, by claiming that the futures commission merchant prevented Prime Trading, Inc., from recouping the farmers' losses. The nature of their third-party claim(s) will be examined next.

Sherman County Bank and Sherman County Management, Inc., allege that 46 bank customers participated in the 2002 commodity trading program, and that all of them requested the bank to fund their margin calls on a continuing basis; that security agreements and assignments of the customers' trading accounts at R. J. O'Brien were executed for this purpose; and that R. J. O'Brien was obligated to notify the bank of any outstanding margin call on these accounts that might threaten its interest, and to give the bank a reasonable opportunity to meet the margin calls. They also allege that program participants were informed about their losses in December 2002 and were given the option of withdrawing or of staying with the program and attempting to recoup their losses by holding long futures contracts and protective long put options in anticipation that the price of corn would rise by 25 cents; all but one customer remained in the program. The trading strategy after December 2002 also allegedly required that the long put options be "rolled forward" to later months until the price rally occurred, and it is alleged that R. J. O'Brien twice accepted orders for this purpose despite outstanding margin calls; that on April 25, 2003, Volf discussed with R. J. O'Brien the need once again to roll forward the long put options, and R. J. O'Brien agreed to a plan to get the margin calls collected; that on April 29, 2003, Volf began placing orders to roll forward the long put options but was told that R. J.

O'Brien would no longer accept any orders from Prime Trading, Inc.; and that even though Sherman County Bank notified R. J. O'Brien that it would immediately wire funds to cover the margin calls, R. J. O'Brien refused to accept the orders, thus forcing Prime Trading, Inc., to liquidate its customers' positions. It is alleged that the objectives for the 2002 commodity trading program would have been met, and the participants would not have incurred any losses, if only R. J. O'Brien had accepted the orders on April 29, 2003, and allowed the program to continue for 10 more days.

Sherman County Bank and Sherman County Management, Inc., claim that if they are required to make restitution, then they are entitled to indemnification from R. J. O'Brien based on certain language contained in the security agreements, and also based on noncontractual indemnity principles. They also allege contingent claims for contribution and equitable subrogation.

Although each count of the third-party complaint contains an allegation that R. J. O'Brien's conduct was the proximate cause of the program participants' losses, there is also a general allegation that "[a]ny damages allegedly suffered by customers are a proximate result of RJO's refusal to let Prime Trading place orders on April 29, 2003, and the forced liquidation of customer accounts." (Filing 44, ¶ 38 (emphasis supplied).) Sherman County Bank and Sherman County Management, Inc., also generally allege that "[i]f liability is imposed on the Bank and the Management Company as a result of the matters alleged in the Complaint, RJO has a contractual and equitable duty to hold the Bank and the Management Company harmless, either totally or in proportion to the relative degree of fault of each party to this action." (Fling 44, ¶ 12.) Liberally construed, the third-party complaint is within the scope of Rule 14(a) impleader.

R. J. O'Brien argues that in order "[t]o allege a proper third-party claim, the Bank and Management Company must allege that RJO was somehow liable for the fraud and unauthorized trading in the customers' accounts [that the Commission alleges Volf, CHS, and Prime Trading, Inc., engaged in]." (Filing 51, p. 5.) This is

10

incorrect. "It is settled that impleader under Rule 14(a) does not require an identity of claims, or even that the claims rest on the same theory. Otherwise the purposes of the Rule would be defeated." American Fidelity & Cas. Co. v. Greyhound Corp., 232 F.2d 89, 92 (5th Cir. 1956) (footnotes omitted). See generally 6 Charles Alan Wright, Arthur R. Miller & May Kay Kane, Federal Practice and Procedure § 1446, p. 372 (2d ed. 1990).

R. J. O'Brien further argues that the trading losses had been incurred by December 2002, and that its alleged failure to accept and execute trades on April 29, 2003, necessarily involves a claim that is separate and distinct from the Commission's restitution claim. The Commission alleges, however, that the fraud and unauthorized trading continued "through at least March 2003," and that Sherman County Bank Bank, "knew that Volf, Prime Trading, and CHS had engaged in unauthorized trading and willfully took steps to prevent the Program participants from withdrawing from the Program by advising the Program participants to stay in the program and further representing to them that Volf would recoup all of their losses." (Filing 25, ¶¶ 2, 54, 61.) The Commission also alleges that "[w]hen it became apparent to the Bank that Prime Trading Program participants would not recoup all of their losses, the Bank lent over $2.5 million in loans to over 40 Program participants . . . at below market interest rates[,]" and that "in April 2003, the Management Company's Board of Director's [sic] passed a resolution to borrow $1 million and loan it to Prime Trading so Prime Trading could reimburse losses sustained by Program participants as a result of Prime Trading's fraud and unauthorized trading." (Filing 25, ¶¶ 62, 59.)

Because the Commission claims that the bank and holding company are liable as principals for unauthorized trading that allegedly occurred while R. J. O'Brien was involved, and also claims the bank willfully aided and abetted the alleged fraud and unauthorized trading by convincing its customers to continue with the trading program in order to recoup their losses through trades executed by R. J. O'Brien, and by advancing money to the customers and to Prime Trading, Inc., it appears eminently reasonable, at first glance, that R. J. O'Brien, which is alleged to have prevented

11

recoupment of the customers' losses by unreasonably halting the trades and refusing to permit the bank to cover margin calls, be impleaded so that all issues of loss-causation may be resolved in a single action. It must be remembered, however, that this is an enforcement action in which restitution is merely an available ancillary remedy.[14] The Commission also is requesting the imposition of a civil penalty against each defendant, disgorgement of profits, and an injunction against further violations of the law. Even though the Commodity Exchange Act does not prohibit impleader,[15]

---

[14] "Although § 6(c), 7 U.S.C. § 13a-1, speaks only in terms of actions to enjoin or restrain violations of the Act, ancillary relief has also been deemed available under that section. See e.g. [CFTC v. CoPetro Mrktg. Group Inc., 680 F.2d 573, 582-83 (9th Cir.1982)]. Such relief may consist of restitution, i.e. 'restoring the status quo and ordering the return of that which rightfully belongs to the purchaser,' Porter v. Warner Holding Co., 328 U.S. 395, 402, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), as well as disgorgement of profits earned by the wrongdoer, CoPetro Marketing, 680 F.2d at 583-4; see also SEC v. Commonwealth Chem. Sec. Inc., 574 F.2d 90, 102 (2d Cir.1978) (Friendly, J.) ('The primary purpose of disgorgement is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up an amount by which he was unjustly enriched.'). Commodity Futures Trading Com'n v. Noble Wealth Data Information Services, Inc., 90 F.Supp.2d 676, 692-93 (D.Md ,2000), aff'd in part and vacated in part, 278 F.3d 319 (4th Cir. 2002). "The Court may order restitution, pursuant to its general equity powers to afford complete relief, and courts regularly order defendants to pay restitution in federal regulatory enforcement actions." Commodity Futures Trading Com'n. v. Emerald Worldwide Holdings, Inc., No. CV03-8339, 2005 WL 1130588, *10 (C.D.Cal. April 9, 2005) (citations omitted). "The appropriate amount of restitution is the total amount invested by customers, less refunds made by the defendants to the customers. Id. See also Noble Wealth Data Information Services, 90 F.Supp.2d at 693.

[15] By contrast, Section 21(g) of the Securities Exchange Act provides that "no action for equitable relief instituted by the Commission pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the Commission, even though such other actions may involve common questions of fact, unless such consolidation is consented to by the Commission." 15 U.S.C.A. §78u(g) (West 1997). This provision was enacted to promote the speedy resolution of SEC enforcement actions, see S. Rep. No. 75, 94th Cong., 1st Sess. (1975), and has been

I conclude in this instance that the Commission's enforcement action should not be encumbered by a third-party action. See U. S. Commodity Futures Trading Com'n v. Calvary Currencies, LLC, No. Civ.A. DKC 2004-1021, 2005 WL 263902 (D.Md. Feb. 2, 2005) (striking third-party complaint that introduced unrelated issues and unduly complicated enforcement action). Because I am striking the third-party complaint, I do not reach the merits of R. J. O'Brien's alternative motion to dismiss.

IT IS ORDERED that:

1. Plaintiff's statement of appeal (filing 46) is denied;

2. Plaintiff's motion for enlargement of time (filing 47) is denied;

3. Plaintiff's duplicative motion for enlargement of time (filing 48) is stricken from the court file;

4. Third-Party Defendant's motion to vacate order (filing 50, part 1) is granted, as follows:

    a. Judge Piester's order of March 16, 2005 (filing 43) is vacated and set aside;

    b. The third-party complaint (filing 44) is stricken; and

    c. R. J. O'Brien Associates is dismissed as a party.

---

held to bar cross-claims, counter-claims and third-party complaints. See, e.g., S.E.C. v. McCaskey, 56 F.Supp.2d 323, 325 (S.D.N.Y. 1999); S.E.C. v. Prudential Securities Inc., 171 F.R.D. 1, 3-4 (D.D.C. 1997); S.E.C. v. Egan, 821 F.Supp. 1274, 1275-76 (N.D.Ill. 1993).

5. Third-Party Defendant's alternative motion to dismiss (filing 50, part 2) is denied without prejudice, as moot.

August 29, 2005.                    BY THE COURT:

                                    s/ *Richard G. Kopf*
                                    United States District Judge